**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **WILLINGBORO MUNICIPAL UTILITIES AUTHORITY,**<br>*Plaintiff,*<br><br>***v.***<br><br>**METHODE ELECTRONICS INC.; URSUM REALTY, INC.; 148 BEVERLY RANCOCAS RD LLC; HI-TEMP SPECIALTY METALS INC.; WILLING B. WIRE CORPORATION; NJ MERO REALTY CO LLC;** ***and*** **JOHN DOE DEFENDANTS 1-20,**<br>*Defendants.* | **C.A. No. 1:26-cv-03192**<br><br>**CERCLA COMPLAINT**<br>**42 U.S.C. §§ 9607(a) and 9613(f)(1)** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW, the Plaintiff, Willingboro Municipal Utilities Authority, (hereinafter "Plaintiff" or "WMUA"), hereby files this complaint against the Defendants METHODE ELECTRONICS INC.; URSUM REALTY, INC; 148 BEVERLY RANCOCAS RD. LLC; HI-TEMP SPECIALTY METALS INC; WILLING B. WIRE CORPORATION; NJ MERO REALTY CO LLC and DOE DEFENDANTS 1-20, fictitious names whose present identifies are unknown (collectively "Defendants") and alleges, upon information and belief, as follows:

**INTRODUCTION**

1. WMUA is a public municipal utilities authority that operates Willingboro's local drinking-water and sanitary-sewer utility system. It produces and distributes potable water for the community servicing over 35,000 people in and around Willingboro, Burlington County, New Jersey, and provides wholesale water to Mt Laurel Twp MUA.

2. Plaintiff drinking water system includes six (6) groundwater wells, along with associated piping and equipment all located throughout Willingboro, New Jersey.

3. Plaintiff groundwater wells have been, and are being, contaminated by 1,4-Dioxane and synthetic per- and polyfluoroalkyl substances ("PFAS"), including chemicals that break down into 1,4-Dioxane and PFAS, that were purchased, consumed, transported, used, processed, mixed, stored, handled, released and/or disposed of by Defendants and/or otherwise released into the environment from Defendant's properties.

4. Both 1,4-Dioxane and PFAS were considered "emerging contaminants" because they have not been routinely monitored in the past, they have a real risk to human health, and until very recently were not regulated.

5. In this civil action, Plaintiff seeks to recover costs associated with the necessary response to contamination of its water supply wells with both 1,4-Dioxane and PFAS, including but not limited to the costs of removing these contaminants as a result of Defendants' tortious conduct and their releases, remedial costs associated with long-term actions to address these releases, as well as investigation and information gathering costs, and groundwater monitoring costs.

6. Plaintiff further brings this action to seek, *inter alia*, available remedies under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); to recover compensatory and all other damages and relief, including all necessary funds to compensate the Plaintiff for the costs of investigating, monitoring, evaluating, abating, and remediating the presence of 1,4-Dioxane, perfluorooctanic acid (PFOA), and perfluorooctane sulfonic acid (PFOS), in its drinking water, including constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA, PFOS (individually

and/ or collectively known as "PFAS") and 1,4-Dioxane, from public water supplies; as well as periodic sampling of groundwater; and for such other damages and relief the Court may order.

7. Plaintiff further brings this action to seek, *inter alia*, available remedies under the New Jersey Spill Compensation and Control Act 58:10-23.11g ("NJSCCA"); to recover compensatory and all other damages and relief, including all necessary funds to compensate the Plaintiff for the costs of investigating, monitoring, evaluating, abating, and remediating the presence of 1,4-Dioxane, perfluorooctanoic acid (PFOA), and perfluorooctane sulfonic acid (PFOS), perfluorononanoic acid (PFNA), perfluoropentanoic acid (PFPEA), perfluorobutanesulfonic acid (PFBS), perfluorohexanoic acid (PFHXA), perfluorohexyl sulfonate (PFHXS), perfluorobutanoic acid (PFBA), perfluoroheptanoic acid (PFHPA), perfluorodecanoic acid (PFDA), perfluoroethane sulfonate (PFPES), perfluoroheptyl sulfonate (PFHPS) in its drinking water, including constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA, PFOS, PFNA PFPEA, PFBS, PFHXA, PFHXS, PFBA, PFHPA, PFDA, PFPES, PFHPS (individually and/ or collectively known as "PFAS") and 1, 4 Dioxane from public water supplies; as well as periodic sampling of groundwater; and for such other damages and relief the Court may order.

8. Defendants are current and/or former operators and/or current owners of the facilities located within the WMUA's public water supply wells' source water protection area and utilized materials containing 1,4-Dioxane, PFAS, and other substances that transform into PFAS through biodegradation, in their business operations, and who either tortiously or through ordinary operations used, released, stored, handled, and/or disposed of 1,4-Dioxane, PFAS, and materials containing these contaminants in such a manner that has caused 1,4-Dioxane and PFAS to migrate into and exist in Plaintiff's drinking water, thereby damaging and injuring Plaintiff.

9. Defendants, as the responsible parties, and not the Plaintiff, it's tax payers, or its customers, should bear all past, present, and future costs of addressing the above presence and removal of 1,4-Dioxane and PFAS from its drinking water supply.

10. Defendants are jointly and severally responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages to Plaintiff, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## JURISDICTION AND VENUE

11. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief). Jurisdiction is also proper in this Court under 42 U.S.C. § 9613(b) (the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")). Pursuant to 28 U.S.C. § 1367(a) the Court has supplemental jurisdiction of all other claims that form part of the same case or controversy under Article III of the United States Constitution. Plaintiff brings this civil suit, in part, pursuant to sections 42 U.S.C. §§ 9607(a) and 9613(g) of CERCLA.

12. This court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) and N.J. Ct. R. 4:4-4(b)(1) by virtue of each Defendant's maintaining regular and systematic contacts with New Jersey – including conducting business and owning property with the State – such that they have purposefully availed themselves of the privilege of conducting activities here. Accordingly, the exercise of jurisdiction by this Court is consistent with due process of law and does not offend traditional notions of fair play and substantial justice.

13. Under 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events giving rise to the Plaintiff's claims occurred in this judicial district, and a substantial part of property that is the subject of this action is situated in this judicial district.

## I. PFAS AND 1,4-Dioxane FACTUAL BACKGROUND

### A. PFAS and Their Risk to Public Health

14. PFAS are man-made manufactured chemical compounds containing fluorine and carbon. The carbon-fluorine bond is one of the strongest bonds in chemistry and provides PFAS their unique chemical properties.

15. These synthetic chemicals have been used for decades and found in a wide range of industrial, commercial, and consumer products and activities such as nonstick cookware, industrial waste disposal, pharmaceutical industry, cosmetics and beauty products, mining, plastic fabrication, and landfills and transfer stations, just to name a few. The wide range of uses is due to their unique properties, such as their mobility, ability to reduce surface tension and use as lubricants, and resistance to heat, water, and oil. In addition, their resistance to high temperatures and chemical reactions makes them ideal for chemical processing and manufacturing. PFAS are also used in chemical manufacturing as surfactants and emulsifiers.

16. Similar to 1,4-Dioxane, according to studies, PFAS have been used in numerous applications and industries, including: adhesives; building and construction industry; cleaning products; coatings, wax, paint, varnish, and inks; electronics industry; plastic and metal etching; metal plating and finishing; packaging, paper, and cardboard; plastics, resins, and rubber; recycling

and material recovery; refrigerants; scientific, general use; semiconductor industry; and textiles, among others.[1]

17. Unlike traditional water contaminants, PFAS can cause human health impacts at incredibly small concentrations. For example, drinking water contaminants like chloride, copper, and nitrate are tested and measured in milligrams per liter; one milligram per liter is equivalent to one part per million. Other drinking water contaminants like lead and sodium are measured in micrograms per liter; one microgram per liter is approximately one part per billion. PFAS are an order of magnitude smaller. PFAS are measured in nanograms per liter; one nanogram per liter is approximately equivalent to one part per *trillion* ("ppt"). To put this in perspective, 1.0 ppt is roughly the equivalent of one drop of water in 20 Olympic-size swimming pools, or 1 second in 32,000 years.

18. PFAS enter the environment, in part, from industrial and commercial facilities that make or use PFAS or PFAS-containing materials, use or make substances that breakdown into PFAS, make other products, through disposal, spills, releases into the environment, effluent runoff from landfills and transfer stations, and waste disposal.

19. Due to their strong chemical bond, PFAS are resistant to degradation due to light, water, and biological processes and remain in the environment, particularly in water, for many, many years and are therefore referred to, colloquially, as "forever chemicals."

20. Because of their unique properties PFAS are mobile and persistent in the environment. PFAS readily contaminates soils and leach from the soil into surface and

[1] *See, e.g.,* Linda G. T. Gaines, PhD, PE, *Historical and current usage of per- and polyfluoroalkyl substances (PFAS): A literature revie*, American Journal of Industrial Medicine, April 20022, *available at*: https://onlinelibrary.wiley.com/doi/full/10.1002/ajim.23362.

groundwater, where they can travel significant distances. PFAS therefore spread easily once released into the environment.

21. Once PFAS enter a water supply they spread rapidly because they are water soluble, with contaminated drinking water reaching every home and a service connection's place of business.

22. EPA has found that PFAS can be released during the manufacturing process through spills, emission vectors, and runoff, and as a component of wastewater and solid waste.[2]

23. PFAS can leach from solid waste directly into the environment.

24. Conventional drinking water treatment processes are ineffective at removing PFAS from the water column.

25. PFAS bioaccumulate, meaning that they tend to accumulate in organisms. PFAS bioaccumulate in numerous ways. They are relatively stable once ingested, and bind to proteins and molecules in blood, tissues, and organs rather than fat like many other persistent chemicals. These properties allow them to stay in the human body for long periods of time, and long-term exposure, such as drinking PFAS contaminated water every day, can cause significant accumulation even at low levels of exposure. For example, in humans PFOA and PFOS remain in the body for years. Thus, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present and only increase health risks over time.

26. PFAS also biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

---

[2] *See, e.g.*, EPA, *Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances – Version 2 (2024)*, April 8, 2024, *available at*: https://www.epa.gov/system/files/documents/2024-04/2024-interim-guidance-on-pfas-destruction-and-disposal.pdf.

27. PFAS are toxic and cause significant adverse effects to human health. Human studies show associations between PFOA and PFOS levels in blood and an increased risk of several health effects, including effects on the liver, the immune system, increased risk of high blood pressure, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer. In addition, PFOA is associated with high cholesterol, decreases in antibody responses to vaccines, high blood pressure and preeclampsia during pregnancy, and decreased birthweight.

28. These injuries can arise months or years after exposure to PFAS.

29. PFAS' extreme persistence in the environment and its toxicity, mobility, and bioaccumulation potential, pose significant adverse effects to human health and the environment.

30. PFOS, PFOA, perfluoroheptanoic acid (PFHpA), perfluorohexanoic acid (PFHxA), and (PFHxS) are among the 29 contaminants now being monitored under EPA's Fifth Unregulated Contaminant Monitoring Rule ("UCMR 5"), a rule EPA promulgated under the Safe Drinking Water Act.[3] This rule is part of a federal initiative to collect data on unregulated contaminants in public drinking water systems. The goal is to determine the prevalence, concentration, and human health impact of these contaminants and assess whether future regulation of them is necessary to protect public health.

31. PFAS in general cause significant health impacts, such as diminished antibody responses to vaccines and reduced immune cell function leading to increased susceptibility to infections.

---

[3] Final Rule, Revisions to the Unregulated Contaminated Monitoring Rule (UCMR 5) for Public Water Systems and Announcement of Public Meetings, 86 Fed. Reg. 73131 (Dec. 27, 2021).

32. EPA has concluded that PFOS and PFOA are likely to be carcinogenic to humans, and likely to cause hepatic, immunological, cardiovascular, and developmental effects in humans.

33. PFHpA is suspected to cause cancer, cause endocrine disruption, accelerated puberty, cause liver and immune system damage, and linked to reduced fertility and low birth rates. Chronic exposure to PFHpA, such as consuming contaminated drinking water over an extended period, poses serious health risks.

34. EPA has identified health risks associated with PFNA, especially through drinking water. These include developmental effects, immune system impacts, thyroid issues, and neurodevelopmental problems. PFNA has been used in products including cleaning and polishing products and is a breakdown of other PFAS.

35. Research indicates exposure to PFHxS has been linked to various potential health effects, including impacts on the thyroid, affecting metabolism, development, and neurological function; liver toxicity and increased incidence of liver tumors; developmental issues, such as delayed puberty and reduced birth weight; and potential kidney damage. PFHxS is particularly persistent in humans, with a half-life of 5-8 years. Chronic exposure to PFHxS, such as consuming contaminated drinking water over an extended period, poses serious health risks. PFHxS is used in water and stain coatings for consumer products like electronics and packaging. It has been used industrially as a surface protection agent for cleaning and polishing products, and other industrial fluids and water-proofing agents.

36. It has been the State of New Jersey history to include a vision, policy and regulatory framework to tackle environmental damages to its territory. In 2018, New Jersey, became the first state in the nation to adopt an enforceable drinking water standard for a PFAS chemical; PFNA. The adoption of this, and two other PFAS MCLs that followed, was another chapter in New Jersey's

long history of exercising state authority pursuant to the New Jersey Safe Drinking Water Act, which enables to establish MCLs for constituents found in drinking water that are harmful to human health.[4]

37. On April 10, 2024, EPA announced enforceable levels for PFOA, PFOS, and other PFAS in drinking water. EPA set maximum containment levels (MCLs) for PFOA and PFOS at 4.0 ppt (also expressed as ng/L) under the Safe Drinking Water Act.[5] On May 14, 2025, the Trump Administration announced that EPA would retain drinking water standards for PFOA and PFOS and reevaluate standards EPA had set for others.[6]

38. Effective July 9, 2024, EPA designated both PFOS and PFOA as a "hazardous substance" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.,* because EPA determined that PFOS and PFOA "may present a substantial danger to the public health or welfare or the environment when released."[7] Under CERCLA, the quantity or concentration of a hazardous substance is not a factor.

39. On May 2025 the EPA Administrator, Lee Zeldin announced that the agency's stance on PFOS and PFOA will not change: "The work to protect Americans from PFAS in drinking water started under the first Trump Administration and will continue under my leadership," … "We are on a path to uphold the agency's nationwide standards to protect Americans from PFOA and PFOS … This will support water systems across the country, including small

---

[4] See https://dep.nj.gov/wp-content/uploads/pfas/docs/njdep-pfas-strategy-2025.pdf#page=6 citing: NJ Rev Stat § 58:12A-13 (2024)

[5] *See* Final Rule, PFAS National Primary Drinking Water Standards, *See* 89 Fed. Reg. 32532 (April 26, 2024).

[6] *See* EPA Press Release, *EPA Announces it Will Keep Maximum Containment Levels for PFOA, PFOS* (May 14, 2025), *available at*: https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos.

[7] Final Rule, Designation of Perfluorooctanic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed Reg. 39124 (May 8, 2024).

systems in rural communities, as they work to address these contaminants. EPA will also continue to use its regulatory and enforcement tools to hold polluters accountable."[8]

## B. BACKGROUND OF 1,4-DIOXANE AND THEIR RISK TO PUBLIC HEALTH

40. 1,4-Dioxane, a synthetic industrial chemical, is a highly toxic substance. It has been found to migrate considerably farther in groundwater than other solvents, due to the compound's complete miscibility and the absence of conditions that promote its biodegradation. When in water, 1,4-Dioxane does not respond to air stripping or granular activated carbon treatment.

41. 1,4-Dioxane (also known as dioxane, p-dioxane, diethylene oxide, 1,4-diethylene dioxide, and glycol ethylene ether) is a synthetic organic compound historically used in various industrial applications.[9]

42. 1,4-Dioxane is most commonly associated with chlorinated solvents due to its use as a stabilizer in such solvents. Various industries and military operations have used chlorinated solvents for degreasing, for preparation of materials for chrome plating and other coatings, and for equipment repair and maintenance.

43. 1,4-Dioxane is also found as an impurity in antifreeze and in some consumer products. 1,4-Dioxane was mainly used as a stabilizer for chlorinated solvents such as 1,1,1-Tricloroethane (TCA); and in Trichloroethylene (TCE), a degreaser for metal parts. It has been used in such industries as solvent stabilizers; medical, pharmaceutical, and biochemical industry;

---

[8] https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos

[9] *See* 1,4-Dioxane 1. History of Use and Potential Sources; Interstate Technology & Regulatory Council (*available at* https://14d-1.itrcweb.org/history-of-use-and-potential-sources/)

rubber and plastics; inks, paints and coatings; adhesives, automotive fluids, aircraft fluids, pesticides, some consumer products as well as other industrial applications.

44. 1,4-Dioxane is classified by the EPA as "likely to be carcinogenic to humans" by all routes of exposure. Short-term exposure may cause eye, nose and throat irritation, and damage caused by long-term exposure includes kidney and liver damage. 1,4- Dioxane is listed as No. 214 on the 2017 CERCLA Priority List of Hazardous Substances issued by the Agency for Toxic Substances and Disease Registry.

45. Maximum Contaminant Levels ("MCLs") are enforceable drinking water standards determined by weighing the costs of treating contaminated water against the adverse health effects of the chemical.

46. In 2016, EPA designated 1,4-Dioxane as one of the first 10 chemicals for risk evaluation under the newly amended Toxic Substances Control Act, 15 U.S.C. §§ 2601, *et seq.*, (TSCA). In November 2024, the United States Environmental Protection Agency (EPA) concluded its risk evaluation for 1,4-Dioxane, an eight-year study, and determined that 1,4-Dioxane "presents an unreasonable risk of injury to human health."[10] EPA identified health risks such as several types of cancer, including lung and liver cancer. Short-term exposure may cause eye, nose and throat irritation, and long-term exposure includes kidney and liver damage. In this final risk evaluation for 1-4-Dioxane, EPA identified health risks including risks of liver toxicity, adverse effects in the olfactory epithelium, and cancer from inhalation or dermal exposures to 1,4-Dioxane, as well as from ingestion of drinking water contaminated with 1,4-Dioxane.

---

[10] EPA, *Nontechnical Summary of the TSCA Risk Evaluation for 1,4-Dioxane*, (Nov. 2024), *available at*: https://www.epa.gov/system/files/documents/2024-11/5.-1-4-dioxane-.-nontechnical-summary-.-public-release-.-nov-2024.pdf.

47. The NJDEP has adopted a Ground Water Quality Standard (GWQS) of 0.4 µg/L. Of an estimated state population of 8.9 million, about 3 million people rely on ground water from public water supply wells and private domestic potable wells. The ground water quality standard for 1,4-dioxane ensures that a current and scientifically based standard to protect, maintain, and restore ground water quality is in place. The ground water quality standards also establish minimum standards for the remediation of contaminated ground water.

48. There are no current federal or New Jersey drinking water standards for 1,4-dioxane. The New Jersey Drinking Water Quality Institute (DWQI), comprised of the state's leading water quality experts, recommended a health-based drinking water Maximum Contaminant Level (MCL) of 0.33 µg/L, which was accepted by DEP in December 2021. Following this, the DEP has initiated the stakeholder engagement in anticipation of rulemaking to establish and implement an MCL for 1,4-dioxane.[11]

49. EPA has listed 1,4-Dioxane as a "hazardous substance" under CERCLA because it is classified as a hazardous air pollutant under the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*, and a hazardous waste under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, *et seq.*, (RCRA). *See* 40 C.F.R. § 302.4, Table 302.4.

50. 1,4-Dioxane is short-lived in the atmosphere, but leaches readily from soil to groundwater, migrates rapidly in groundwater, does not react with oxygen, and soil microorganisms do not degrade it. It therefore remains ever present until removed.

51. The EPA regulates 1,4-Dioxane under the Clean Air Act, CERCLA, and RCRA.

52. After EPA finalized its risk evaluation for 1,4-Dioxane in November 2024, it will now determine appropriate regulations under TSCA and the Safe Drinking Water Act, 42 U.S.C.

[11] https://dep.nj.gov/14-dioxane/#regulating-dioxane

§ 300f, *et seq*. EPA has not established drinking water standards for 1,4-Dioxane, but in 2013 EPA had issued guidelines and health standards for it, establishing a screening level of 0.67 parts per billion (ppb) for it in tap water, based on a 1 in $10^{-6}$ lifetime excess cancer risk.[12] Given the recent risk determination, this level will certainly change.

## C. PFAS AND 1,4-DIOXANE ACCESS TO OUR NATIONAL WATER SUPPLIES

53. 1,4-dioxane's unique chemical properties and broad use have resulted in widespread environmental contamination of ground and surface water.[13] 1,4-Dioxane is among the most mobile organic contaminants in the saturated zone. As a result, it may be found farther downgradient than the leading edge of a solvent plume.[14] The source of these contaminates is likely industrial wastewater, either directly from industrial wastewater treatment plants or from sewer collection systems, released into municipal wastewater treatment facilities.

54. The fate and transport of 1,4-dioxane in the environment is controlled by the compound's physical and chemical properties, media transport characteristics, and the favorability of conditions for biodegradation. 1,4-dioxane has the potential to travel at the approximate velocity of groundwater, and this characteristic is particularly important in high-permeability zones.[15]

55. Same as 1,4 Dioxane, PFAS can reach groundwater and surface waters when products containing PFAS are spilled, released, or disposed of, on the land surface or through

---

[12] *See* EPA, Technical Fact Sheet – 1,4-Dioxane (Jan. 2014), *available at*: https://semspub.epa.gov/work/01/575107.pdf.

[13] 1,4-Dioxane: Why Drinking Water Regulations Won't Work to Mitigate This Carcinogenic "Forever Chemical" - Scott Hudson https://law.lclark.edu/live/blogs/188-14-dioxane-why-drinking-water-regulations-wont

[14] See EPA Treatment Technologies For 1,4-Dioxane: Fundamentals And Field Applications (available at https://www.epa.gov/sites/default/files/2015-08/documents/treatment_for_1-4-dioxane_542r06009.pdf)

[15] *See* 3. Environmental Fate, Transport, and Investigative Strategies; 1,4-Dioxane; Interstate Technology & Regulatory Council (*available at* https://14d-1.itrcweb.org/environmental-fate-transport-and-investigative-strategies/)

sewer system. PFAS have the ability to move easily through some ground surfaces and can reach groundwater that is used for public water supplies or for private drinking water wells.[16]

56. Due to their widespread production and use, as well as their ability to move and persist in the environment, surveys conducted by the Centers for Disease Control and Prevention (CDC) show that most people in the United States have been exposed to some PFAS.[17] Possible PFAS sources in water can include industrial and hospital wastewater, landfill leachate, or washing facilities. Knowing the sources of PFAS in water resources is critical for developing cost-effective approaches to managing PFAS contamination.[18]

57. PFAS and 1,4-Dioxane have been ordinary used in chemicals in a variety of industrial uses and applications. Their fate to access and impact groundwater sources rest upon routine uses and applications, accidental spills, leachate from pools, and their disposal in sewers or dry wells. This impact is amplified due that many of the nation's water utilities, including the plaintiffs', are/or were not equipped with PFAS and 1,4-Dioxane removal capabilities[19]. Therefore,

---

[16] *See* ENVIRONMENTAL AND HEALTH IMPACTS OF PFAS; Wisconsin Department of Natural Resources (*available at* https://dnr.wisconsin.gov/topic/PFAS/Impacts.html#:~:text=PFAS%20can%20reach%20groundwater%20and,for%20private%20drinking%20water%20wells)

[17] *See* PFOA, PFOS and Other PFAS; Our Current Understanding of the Human Health and Environmental Risks of PFAS (*available at* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas)

[18] *See* Water Research on Per- and Polyfluoroalkyl Substances (PFAS) (*available at* https://www.epa.gov/water-research/water-research-and-polyfluoroalkyl-substances pfas#:~:text=filtration%20systems%20fared.-,PFAS%20Sources%20and%20Occurrence%20in%20Water,PFAS%20and%20improve%20treatment%20technologies.)

[19] *See* PFAS in wastewater; Department of Ecology State of Washington (available at https://ecology.wa.gov/waste-toxics/reducing-toxic-chemicals/addressing-priority-toxic-chemicals/pfas/wastewater#:~:text=Nearly%20all%20municipal%20wastewater%20treatment,technologies%20do%20not%20destroy%20PFAS. *And* 6. Remediation and Treatment Technologies; 1, 4 Dioxane; Interstate Technology & Regulatory Council (*available at* https://14d-1.itrcweb.org/remediation-and-treatment-technologies/#:~:text=1%2C4%2DDioxane%20is%20not,unless%20additional%20treatment%20occurs%20afterward.

the water received and treated by them is highly susceptible to the presence of PFAS and 1,4 contaminations.

## D. PFAS and 1,4-Dioxane in WMUA Public Water Supply

58. WMUA utilizes four water treatment plants (WTPs) to supply its approximately 13,000 retail customers (est. retail service population 35,000) and its bulk water supply customer Mount Laurel Township MUA with potable water.

59. WMUA WTPs are sourced from 6 groundwater wells.

60. Plaintiff's groundwater wells are screened in and draw water from the Potomac-Raritan-Magothy Aquifer[20] which is part of the New Jersey Coastal Plain Aquifer System.

61. New Jersey Coastal Plain Aquifer System is designated by the U.S. Environmental Protection Agency as "sole-source" aquifer.[21] This means that the aquifer supplies at least 50 percent of the drinking water for its service area, **and there are no reasonably available alternative drinking water sources** should the aquifer become contaminated.[22]

62. The New Jersey Coastal Plain aquifer receives recharge from the Delaware river. For this reason, the Coastal Plain Sole Source Aquifer stream-flow source zone includes all of the upstream portions of the Delaware River in New Jersey, Pennsylvania, and New York. For some sole-source aquifers, the recharge zone and the stream-flow source zone coincide. USEPA limits its projects- review area to the recharge zone and that portion of the stream-flow source zone that lies within two miles of the main stem, Delaware River [23].

[20] https://wmua.info/consumer-confidence-reports/#

[21] https://pubs.usgs.gov/fs/1995/0086/

[22] https://www.epa.gov/dwssa/overview-drinking-water-sole-source-aquifer-program#What_Is_SSA

[23] https://dep.nj.gov/wp-content/uploads/njgws/maps/ofmap/ofm26.pdf

63. The majority of the aquifers, including The Potomac-Raritan-Magothy Aquifer are confined except where they crop out or are overlain by permeable surficial deposits. The aquifers are recharged directly by precipitation in outcrop areas, by vertical leakage through confining beds, and by seepage from surface-water bodies.[24]

64. On November 8, 2021, Plaintiff received a notice that the samples collected during the New Jersey mandated testing events showed that the water system exceeded the NJ PFOS MCL. PFAS as well as 1,4-Dioxane were detected in WMUA's Wells.

65. The testing mandated by EPA and New Jersey shows Plaintiff has elevated levels of PFOS, PFOA, PFNA, PFPEA, PFBS, PFHXA, PFHXS, PFBA, PFHPA, PFDA, PFPES, PFHPS and 1,4 Dioxane, including the following results on Plaintiff water wells:

| | **Well 1** | | **Well 5A** | | **Well 6** | | **Well 9** | | **Well 10** | | **Well 11** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Analyte** | **Date** | **PPT** | **Date** | **PPT** | **Date** | **PPT** | **Date** | **PPT** | **Date** | **PPT** | **Date** | **PPT** |
| **PFOS** | 4/5/23 | 5.7 | 10/17/20 | 18 | 11/17/20 | 2.4 | 8/3/2022 | 67 | 8/2/23 | 3.7 | 3/21/21 | 44 |
| **PFNA** | 8/2.23 | 1.9 | 10/5/22 | 1.1 | | | | | | | 10/5/22 | 1.1 |
| **PFOA** | 8/2/23 | 11 | 12/7/22 | 8.2 | 10/5/22 | .46 | 8/2/23 | 2.0 | | | 6/7/23 | 41 |
| **PFPEA** | 4/6/22 | 3.1 | 10/5/22 | 2.2 | | | | | | | 10/5/22 | 1.2 |
| **PFBS** | 1/26/21 | 2.8 | 1/26/21 | 2.1 | | | | | | | 10/5/22 | 1.2 |
| **PFHXA** | 8/2/23 | 4.3 | 9/14/22 | 3.1 | | | | | | | 6/21/21 | 3.4 |
| **PFHXS** | 6/1/22 | 3.9 | 11/2/22 | 9.2 | | | 8/2/23 | 4.1 | 8/2/23 | 2.7 | 12/22/21 | 21 |
| **PFBA** | 4/6/22 | 2.2 | | | | | | | | | | |
| **PFHPA** | 8/2/23 | 2.8 | 11/2/22 | 1.9 | | | | | | | 10/5/22 | 1.0 |
| **PFDA** | 10/5/22 | .07 | | | | | | | | | | |
| **PFPES** | | | 10/5/22 | 1.2 | | | | | | | 10/5/22 | 1.5 |
| **PFHPS** | | | | | | | | | | | 10/5/22 | .8 |

| | **Well 1** | | **Well 5A** | | **Well 6** | | **Well 9** | | **Well 10** | | **Well 11** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Analyte** | **Date** | **Ppb** | **Date** | **Ppb** | **Date** | **Ppb** | **Date** | **Ppb** | **Date** | **Ppb** | **Date** | **ppb** |
| **1,4-Dioxane** | 8/3/22 | .067 | 1/8/25 | .066 | 6/24/2014 | .24 | 10/23/24 | 1200 | 3/12/25 | .73 | 3/12/25 | .350 |

66. The State of New Jersey adopted the NJSCCA in 1976. This statute provided New Jersians with a comprehensive framework for responding to environmental spills and

[24] https://www.usgs.gov/centers/new-jersey-water-science-center/major-aquifers-new-jersey

contamination, including the potential claim of damages. These provisions include guidance that triggers environmental compliance, remediation, and cleanup of state waters and their drinking-water systems in the event of hazardous chemical spills.

67. Upon learning of PFAS contamination of its supply wells, Plaintiff began the planning assessments in order to protect the health of its residents and consumers, and to comply with State and federal drinking water standards.

68. As a result, Well 5A WTP and Well 5A were removed from service on November 30, 2021 following a Notice of Compliance from NJDEP due to a PFOS Running Annual Average of 15.5 ppt which exceeded the New Jersey 13 ppt MCL.

69. The Well 5A WTP PFOS Treatment System Upgrade contract was awarded on May 19, 2022, in the amount of $5,267,000.

70. The Granular Activated Carbon (GAC) project went online to the distribution system on March 12, 2024. The complete improvements are designed and sized only for the additional PFOS treatment system.

71. Efforts pertaining to PFAS and 1,4-Dioxane remediation do not conclude here. Plaintiff is presently engaged in the preliminary planning phase to evaluate contamination levels in Wells 9, 10, and 11. The anticipated capital expenditure associated with this undertaking is approximately $20,000,000. This sum does not include the O&M costs.

## E. Comprehensive PFAS and 1,4 Dioxane Contamination Pathway

72. The Source Water Assessment Program (often abbreviated "SWAP" or "SWA") is a Safe Drinking Water Act ("SDWA") program implemented by States to evaluate the vulnerability of public drinking water sources to contamination. Following the 1996 SDWA amendments, States developed and implemented assessment programs to identify (i) the areas that

contribute water to public water system sources and (ii) the significant potential contaminant sources located within those areas, and to evaluate the susceptibility of the public water system's source water to contamination.[25]

73. EPA describes source water assessments as studies or reports prepared for public water systems to generate information about significant potential contaminant sources and the potential for drinking water sources to be impacted by those sources.[26]

74. The 1986 SDWA Amendments created a State Wellhead Protection ("WHP") Program designed to protect areas surrounding public supply wells against contaminants that may adversely affect human health (SDWA § 1428; codified at 42 U.S.C. § 300h-7). EPA prepared technical guidance to assist States and local governments in delineating wellhead protection areas.

75. Under SDWA § 1428(e), a "wellhead protection area" ("WHPA") is the surface and subsurface area surrounding a public water supply well or wellfield through which contaminants are reasonably likely to move toward and reach that well or wellfield.

76. EPA's 1987 delineation guidance discusses factors relevant to setting WHPA boundaries, including (among other factors) the radius of influence around a well, drawdown, time or rate of travel of contaminants, distance from the well or wellfield, and other hydrogeologic considerations supported by pump-test data, field reconnaissance, topographic information, and local geology.[27]

77. Plaintiff's public water supply system relies in whole or in part on one or more groundwater production wells and related source-water infrastructure (the "Public Water Supply Wells").

---

[25] 42 U.S.C. § 300j-13 - Source water quality assessment

[26] https://www.epa.gov/sourcewaterprotection/source-water-assessments

[27] EPA 1987 guidance: https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=00001OZC.txt

78. The groundwater produced by the Public Water Supply Wells is part of and hydraulically connected to the surrounding aquifer system that underlies Plaintiff's service area and adjacent areas.

79. Pursuant to the Safe Drinking Water Act and related implementing requirements, New Jersey State conducted a Source Water Assessment Program ("SWAP") for public water suppliers in New Jersey in the early 2000s.

80. As part of the SWAP, the State of New Jersey Department of Environmental Conservation ("NJDEC") performed hydrogeologic analyses to evaluate the groundwater sources serving public water systems.

81. For groundwater-supplied public water systems, the SWAP process included delineation of the area of land that contributes groundwater recharge to the public supply wells (the "Source Water Assessment Area" or "SWAP Area").

82. NJDEC's SWAP delineations were intended to identify the geographic areas within which releases of hazardous substances may migrate through groundwater and impact public water supply sources.

83. Based on those analyses, NJDEC prepared maps and related assessment materials ("SWAP Maps") depicting the Source Water Assessment Area associated with Plaintiff's Public Water Supply Wells.

84. The SWAP Maps for Plaintiff's public water supply sources identify and depict the contributing area(s) to Plaintiff's Public Water Supply Wells—i.e., the area where infiltrating water can migrate through the aquifer system and be captured by pumping at the Public Water Supply Wells.

85. The SWAP Maps and associated assessment work reflect the State of New Jersey's recognition that groundwater resources used for public drinking water are vulnerable to contamination resulting from releases occurring within contributing recharge areas.

86. The SWAP Maps further reflect that releases of hazardous substances from industrial and commercial properties located within the Source Water Assessment Area may present a foreseeable risk of migration to the Public Water Supply Wells through groundwater transport.

87. The EPA has established a list based on the North American Industry Classification System ("NAICS") Codes and Standard Industrial Classification System ("SIC") Codes, based on EPA records, for entities that have a high risk for the use of PFAS.[28] EPA uses this data in its PFAS Analytical Tools.[29]

88. Several industrial facilities are located within Plaintiff wellhead protection area and historic contamination at these facilities contributed to the contamination of the Plaintiff public supply wells.

89. Each Defendants' facility, or facilities, is or are located within the SWAP and each facility has one or more of EPA's identified high risk PFAS NAICS and SIC codes, and PFAS released from them migrated to Plaintiff's Water Source.

90. Contamination from industrial and commercial operations, like those of the Defendants, can significantly impact groundwater used for drinking water supplies.

91. PFAS and 1,4-Dioxane have been released from Defendants' facilities via several pathways. These pathways include wastewater discharge, with PFAS and 1,4-Dioxane

---

[28] *See, e.g.,* EPA, *Metadata for Data Sources within PFAS Analytic Tools (Public)*, July, 2022, (*available at*, https://echo.epa.gov/system/files/PFASAnalyticToolsPUBLICMetadata7-13-2022.508_0.pdf.)

[29] *See* EPA, PFAS Analytical Tools, (available at, https://echo.epa.gov/trends/pfas-tools.)

contaminated wastewater is discharged directly into waterways; solid waste, and PFAS and 1,4-Dioxane contaminated solid waste and/or sludge leaching into groundwater.

92. All of the above pathways have been found to be significant migration patterns for PFAS and 1,4-Dioxane compounds.

93. The extreme stability of PFAS and 1,4-Dioxane compounds means that natural systems that might filter out or mitigate the migration of other contaminants are not as effective for PFAS and 1,4-Dioxane compounds, the same is true for traditional wastewater treatment plants.

94. The very low threshold for PFAS compounds in drinking water, which is more than several of orders magnitude smaller than many other contaminants, means that only a minute amounts of PFAS need to be released from a facility to detrimentally impact a water supply.

95. As a result of Defendants' tortious actions, omissions, and conduct in the use, release, storage, handling, and/or disposal of PFAS and 1,4-Dioxane materials at, near, or within the vicinity of Plaintiff Water Source, and within the wellhead protection area for Plaintiff's Water Source, PFAS and 1,4-Dioxane have been caused to migrate into and exist in Plaintiffs' Water Source and property, thereby damaging and injuring Plaintiff.

96. Defendants, as the parties responsible, and not Plaintiff, their taxpayers, or their customers, should bear all past, present, and future costs of addressing the above contamination and removing PFAS and 1,4-Dioxane from the water supply.

97. Upon information and belief, the Defendants are responsible, negligently, intentionally and/or in some actionable manner, through ordinary use and operation, jointly and severally, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiff, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership,

maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## II. THE PARTIES

**Plaintiff**

98. **Plaintiff, WILLINGBORO MUNICIPAL UTILITIES AUTHORITY,** ("Willingboro", "WMUA" or "Plaintiff") is a New Jersey political subdivision with its principal place of business located at 433 JFK Way, Willingboro NJ 08046. Plaintiff manages, operates, and controls a water supply system, pursuant to the Laws and Regulations of New Jersey and under 42 U.S.C. §300f et seq. (1974)

99. Willingboro is part of the New Jersey history of economic and community development of Burlington County. In 1977 WMUA championed the effort to serve its clients when it entered into a "201 Study Commission" formally called the Upper Rancocas Sewerage Study Commission ("URANCO"). The study area included Willingboro, Edgewater Park, Beverly, Delanco, and portions of Westampton. Willingboro was designated as the Lead Agency. URANCO as it was structured consisted of five (5) representatives from Willingboro Township; two (2) representatives from Edgewater Park; and one (1) member each from Beverly and Westampton.

100. At all relevant times herein, WMUA has and continues to own, operate and is charged with the responsibility of delivering safe, reliable, and high-quality water that meets state and federal standards to the residents and businesses of the township and its surroundings, including nearby towns, and has a duty to exercise due care and diligence in the maintenance and supervision of all sources of the public water system to prevent, so far as possible, its pollution and depletion, and pursuant to the applicable laws and regulations.

**Defendants**

101. **Defendant, METHODE ELECTRONICS, INC.,** ("Methode") is a Delaware Corporation, with its headquarters located at 8750 West Bryn Mawr Avenue, Suite 1000, Chicago IL 60631, is subject to process of service via it's registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington DE 19801.

102. Methode is a pioneer in the development of printing and etching techniques that permitted volume manufacturing of printed circuit boards ("PCB") for consumer electronics and patented a "printed circuit socket;" designed and began manufacturing connectors for use with PCBs, automotive controls and switches.[30]

103. Methode owned and operated the former Methode Electronics Facilities (Methode Facilities") located at 10 Industrial Drive, Willingboro Township, Burlington County, New Jersey (the "Methode Facility 10"), and 1 Industrial Park, Willingboro, NJ 08046 (the "Methode Facility 1"), approximately two miles east of the Delaware River, one-half mile southeast of route 130, and one-half mile north of Rancocas Creek.

104. The Methode Facilities manufactured printed wiring boards from its construction in 1970 until it ceased operation in 1999. The primary industrial activities performed at the Methode Facility included etching, plating, drilling, electrical testing, multi-layer board fabrication, screen printing, photo printing, and graphics production.

105. Activities at the site included the storage of waste (primarily aqueous and sludges) in dumpsters and drums, the storage of raw materials in drums, and discharge of treated wastewater

[30] Source: https://methode.com/company/

to the sanitary sewer through a partially underground concrete flow through wastewater treatment tank used for sludge settling.

106. The Methode Facility has been associated with several environmental compliance issues. On December 16, 1988, an incident was documented involving waste solvents that were classified as an illegal disposal practice. Another spill occurred on January 25, 1991 involving 500 gallons of liquid effluent contaminated the land.

107. Some of the Chemicals and Hazardous Wastes found at the Methode Facility include 1,1,1-trichloroethane (TCA) and other volatile organic compounds ("VOCs"), which were first discovered in groundwater at the site in 1988. VOCs and inorganic contaminants, including arsenic, copper, lead and nickel, were also identified in the soil. VOCs have since been detected in the shallow groundwater throughout much of the site and in deeper groundwater, as well as in off-site locations. See ("Groundwater impacts were first discovered in 1988 during closure of the concrete-lined, partially inground tank (AOC 4). VOCs, primarily trichloroethylene (TCE) and 1,1,1-trichloroethane (1,1,1-TCA) were detected, but reportedly were never associated with AOC 4. VOCs have since been detected above the New Jersey Ground Water Quality Criteria (NJ GWQC) in groundwater throughout much of the shallow groundwater zone across the facility and in deeper saturated zones, as well as in off-site locations") [31]. These detections include considerable levels of TCA at 1,230; and 1,1-DCE at 3,770 and 1,1-DCA at 1,120 which are also a breakdowns product of TCA.

---

[31] https://19january2021snapshot.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-methode-electronics-incorporated-willingboro_.html

108. Methode industrial activities such as plating and board fabrication are associated with PFAS and 1,4-dioxane. Both 1,4-dioxane and PFAS are documented as known to be present at the Methode Facility.

109. On information and belief, Methode caused and/or contributed to the disposal and release of PFAS, 1,4-dioxane, and/or wastes containing such hazardous substances at the Methode Facility, including through: (a) releases from process equipment, tanks, and drums; (b) discharge of contaminated process water and stormwater; (c) historical handling and storage practices for waste oils, solvents, and cleaners; and (d) other industrial waste-management practices typical of these type of facilities of that era.

110. PFAS, 1,4-dioxane, and related hazardous substances released at or from the Methode Facility 1 and Methode Facility 10 migrated via soil and groundwater and have impacted, or threaten to impact Plaintiff Supply Wells.

111. As the current owner of a facility at which hazardous substances have been released and from which there has been a threatened release of hazardous substances, Methode is a responsible party within the meaning of 42 U.S.C. § 9607(a)(1).

112. **Defendant, URSUM REALTY, INC.,** ("URSUM") is a New York Corporation, and is subject to process of service via its registered agent, Abdul K Sagee, 830 Coney Island Avenue, Brooklyn NY 11218.

113. At all relevant times, URSUM has conducted business in the State of New Jersey and has owned, controlled, managed, developed, and/or maintained the "Methode Facility 1" located at 1 Industrial Drive Ironside Court, Willingboro, New Jersey, which constitutes a "facility" within the meaning of 42 U.S.C. § 9601(9).

114. Hazardous substances, including but not limited to PFAS (and/or 1,4-Dioxane) and related compounds, have been disposed of, released, discharged, spilled, leaked, or otherwise come to be located at the Property. These hazardous substances have migrated and continue to migrate from the Property into surrounding soil and groundwater, including groundwater supplying Plaintiff's public drinking water system.

115. Defendant acquired title to the Property after hazardous substances had been released and/or disposed of at the site and has owned the Property during the time hazardous substances have been present in environmental media and have continued to migrate off-site.

116. Upon information and belief, the Property is located within the capture zone and/or wellhead protection area of Plaintiff's public drinking water supply wells. PFAS are persistent and readily mobile in groundwater and migrate with natural groundwater flow through the aquifer. Consistent with these characteristics and the relative location of the Property to Plaintiff's wells, PFAS and 1,4 Dioxane present at and released from the Property have migrated and continue to migrate or pose a substantial threat of migration, toward and into Plaintiff's supply wells. As a result, releases and threatened releases from the Property have contaminated and/or threaten to contaminate water pumped for public consumption.

117. As the current owner of a facility at which hazardous substances have been released and from which there has been a threatened release of hazardous substances, Defendant is a responsible party within the meaning of 42 U.S.C. § 9607(a)(1).

118. **Defendant, 148 BEVERLY RANCOCAS ROAD LLC,** ("Rancocas LLC") is a Pennsylvania Limited Liability Company and is subject to process of service via it's registered agent, Anthony D. Cino, Makefield Executive Quarters, 301 Oxford Valley Road, Suite 702, Yardley PA 19067.

119. At all relevant times, Rancocas LLC has conducted business in the State of New Jersey and has owned, controlled, managed, developed, and/or maintained an industrial facility located at 148 Beverly-Rancocas Road, Willingboro NJ 08046 (the "Rancocas Facility"), which constitutes a "facility" within the meaning of 42 U.S.C. § 9601(9).

120. Hazardous substances, including but not limited to PFAS (and/or 1,4-Dioxane) and related compounds, have been disposed of, released, discharged, spilled, leaked, or otherwise come to be located at the Property. These hazardous substances have migrated and continue to migrate from the Property into surrounding soil and groundwater, including groundwater supplying Plaintiff's public drinking water system.

121. Defendant acquired title to the Property after hazardous substances had been released and/or disposed of at the site and has owned the Property during the time hazardous substances have been present in environmental media and have continued to migrate off-site.

122. Upon information and belief, the Property is located within the capture zone and/or wellhead protection area of Plaintiff's public drinking water supply wells. PFAS are persistent and readily mobile in groundwater and migrate with natural groundwater flow through the aquifer. Consistent with these characteristics and the relative location of the Property to Plaintiff's wells, PFAS and 1,4 Dioxane present at and released from the Property have migrated and continue to migrate or pose a substantial threat of migration, toward and into Plaintiff's supply wells. As a result, releases and threatened releases from the Property have contaminated and/or threaten to contaminate water pumped for public consumption.

123. Before Rancocas LLC took over, the Rancocas Facility was owned and/or operated by several industrial entities, including Aurora Metals, a corporation that maintained a tantalum treatment operation at the Rancocas Facility using multiple tanks of hydrochloric acid each day to

treat metals. The facility generated up to 50 gallons (1,200 pounds) per day of hydrochloric acid, and as much as 3,000 gallons (24,000 pounds) per month, and was regulated as a Large Quantity Generator of hazardous waste.

124. Aurora Metals accumulated hazardous waste, including waste acid, in drums; and treated those wastes in an on-site Elementary Neutralization Unit.

125. On information and belief, many of the hazardous chemicals were not listed under any rule at the time; therefore, PFAS and 1,4-dioxane waste management were not screened at the Aurora Metals ENU during its operation.

126. On information and belief, Aurora Metals' tantalum and specialty-metal processing operations at the Rancocas Facility utilized surfactants, wetting agents, lubricants, coolants, coatings, and/or other industrial formulations that contained PFAS compounds, and generated PFAS-containing wastewater and sludges.

127. On information and belief, during its operations Aurora Metals also used solvents and cleaning agents, some of which contained chlorinated organics and/or 1,4-dioxane as a constituent, impurity, or stabilizer, and generated solvent-bearing wastes containing 1,4-dioxane.

128. On information and belief, Aurora Metals caused and/or contributed to the disposal and release of PFAS, 1,4-dioxane, and/or wastes containing such hazardous substances at the Aurora Metals Facility through practices that included, without limitation: (a) storage and handling of PFAS- and solvent-containing materials; (b) discharge of process and rinse waters to on-site wastewater systems and stormwater infrastructure; (c) leaks and spills from tanks, drums, piping, and process equipment; and (d) improper management and treatment of hazardous waste in its Elementary Neutralization Unit and related systems.

129. On information and belief, PFAS, 1,4-dioxane, and related hazardous substances released at or from the Aurora Metals operations have migrated, and continue to migrate, in soil and groundwater and have impacted, or threaten to impact Plaintiff Supply Wells.

130. As the current owner of a facility at which hazardous substances have been released and from which there has been a threatened release of hazardous substances, Rancocas LLC is a responsible party within the meaning of 42 U.S.C. § 9607(a)(1).

131. **Defendant, HI-TEMP SPECIALTY METALS INC.,** ("Hi-Temp") is a Delaware Corporation, and is subject to process of service via it's registered agent, National Registered Agents, Inc., 1209 North Orange Street, Wilmington DE 19801.

132. Hi-Temp was founded in 1982 as a recycler and provider of specialty recycled metals for the then-burgeoning super alloy industry. The material provided was primarily tungsten and molybdenum, two of the heaviest metals on earth in areas where high heat tolerances, stress and durability are required. In the late 1980s, tantalum, another refractory metal, was added to the product mix. The original model, which still holds true today, is to recycle these metals in a manner that eliminates the need to source material from ore (in mines) and then upgrade the material into pure forms. Hi-Temp obtained and maintains material approvals from many of the world's largest manufacturers of super alloys where it is authorized and approved to provide scrap and recycled material instead of virgin material.

133. Hi-Temp was the largest manufacturer of such (tungsten and molybdenum) material in the world and is an essential part of the supply chain for many domestic U.S. manufacturers of precision cast parts.

134. Hi-Temp also owned, controlled, managed, developed, and/or maintained the Rancocas Facility from 1999, and within the meaning of 42 U.S.C. § 9601(9).

135. Hazardous substances, including but not limited to PFAS (and/or 1,4-Dioxane) and related compounds, have been disposed of, released, discharged, spilled, leaked, or otherwise come to be located at the Rancocas Facility. These hazardous substances have migrated and continue to migrate from the Property into surrounding soil and groundwater, including groundwater supplying Plaintiff's public drinking water system.

136. Upon information and belief, the Rancocas Facility is located within the capture zone and/or wellhead protection area of Plaintiff's public drinking water supply wells. PFAS are persistent and readily mobile in groundwater and migrate with natural groundwater flow through the aquifer. Consistent with these characteristics and the relative location of the Property to Plaintiff's wells, PFAS and 1,4 Dioxane present at and released from the Property have migrated and continue to migrate or pose a substantial threat of migration, toward and into Plaintiff's supply wells. As a result, releases and threatened releases from the Property have contaminated and/or threaten to contaminate water pumped for public consumption.

137. As a former owner of a facility at which hazardous substances have been released and from which there has been a threatened release of hazardous substances, Hi-Temp is a responsible party within the meaning of 42 U.S.C. § 9607(a)(1).

138. **Defendant, WILLING B. WIRE CORPORATION,** ("Willing Wire") is a Delaware Corporation and is subject to process of service via it's registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington DE 19801.

139. Willing Wire owned and/or operated an industrial facility located at 49 Ironside Court, Willingboro, New Jersey 08046 (the "Willing Wire Facility").

140. Willing Wire as the owner and operator of the Willing Wire Facility held a Industrial Stormwater General Permit under NJPDES, evidencing industrial operations that generated stormwater discharges associated with industrial activity.

141. On information and belief, Willing Wire's operations at the Willing Wire Facility involved Steel Wire Drawing and the frequent use and disposal of Chromium, Manganese, Sodium hydroxide, Ammonia and Nickel.

142. On information and belief, PFAS are used in cable and wire industries such as those engaging steel wire drawing.

143. On information and belief, Willing Wire used PFAS-containing lubricants, surfactants, non-stick coatings, and/or surface-treatment chemicals in connection with its operations, and generated PFAS-containing wastewater and solid wastes.

144. On information and belief, Willing Wire used solvents, degreasers, and cleaning compounds that contained 1,4-dioxane as a constituent or stabilizer, and generated wastewater containing 1,4-dioxane through its cleaning and maintenance operations.

145. On information and belief, Willing Wire caused and/or contributed to the disposal and release of PFAS, 1,4-dioxane, and/or wastes containing such hazardous substances at the Willing Wire Facility, including through: (a) discharges of contaminated stormwater; (b) spills and leaks from storage and handling of PFAS- and solvent-containing products and wastes; and (c) historical practices involving disposal or management of industrial wastewater and solid wastes on or at the facility.

146. A separate entity, American Engraving & Machine Company ("American Engraving") has also operated the Willing Wire Facility.

147. American Engraving's operations at the Willing Wire facility included electroplating, plating, polishing, anodizing, and coloring.

148. On information and belief, American Engraving used PFAS-containing lubricants, surfactants, non-stick coatings, and/or surface-treatment chemicals in connection with its Electroplating, Plating, Polishing, Anodizing, and Coloring operations, and generated PFAS-containing wastewater and solid wastes.

149. On information and belief, American Engraving used solvents, degreasers, and cleaning compounds that contained 1,4-dioxane as a constituent or stabilizer, and generated wastes and wastewaters containing 1,4-dioxane through its cleaning and maintenance operations.

150. On information and belief, American Engraving caused and/or contributed to the disposal and release of PFAS, 1,4-dioxane, and/or wastes containing such hazardous substances at the Willing Wire Facility, including through: (a) discharges of contaminated stormwater; (b) spills and leaks from storage and handling of PFAS- and solvent-containing products and wastes; and (c) historical practices involving disposal or management of industrial wastewater and solid wastes on or at the facility.

151. Upon information and belief, the Willing Wire Facility is located within the capture zone and/or wellhead protection area of Plaintiff's public drinking water supply wells. PFAS are persistent and readily mobile in groundwater and migrate with natural groundwater flow through the aquifer. Consistent with these characteristics and the relative location of the Property to Plaintiff's wells, PFAS and 1,4 Dioxane present at and released from the Property have migrated and continue to migrate or pose a substantial threat of migration, toward and into Plaintiff's supply wells. As a result, releases and threatened releases from the Property have contaminated and/or threaten to contaminate water pumped for public consumption.

152. As a former owner of a facility at which hazardous substances have been released and from which there has been a threatened release of hazardous substances, Willing Wire is a responsible party within the meaning of 42 U.S.C. § 9607(a)(1).

153. **Defendant, NJ MERO REALTY CO LLC,** ("NJ MERO") is the current owner and operator of the Willing Wire Facility site and is subject to process of service via NJ Mero Realty Co LLC, 20 Reed Place, Amityville NY 11701.

154. At all relevant times, NJ MERO has conducted business in the State of New Jersey and has owned, controlled, managed, developed, and/or maintained the Willing Wire Facility within the meaning of 42 U.S.C. § 9601(9).

155. Hazardous substances, including but not limited to PFAS (and/or 1,4-Dioxane) and related compounds, have been disposed of, released, discharged, spilled, leaked, or otherwise come to be located at the Property. These hazardous substances have migrated and continue to migrate from the Property into surrounding soil and groundwater, including groundwater supplying Plaintiff's public drinking water system.

156. Defendant acquired title to the Property after hazardous substances had been released and/or disposed of at the site and has owned the Property during the time hazardous substances have been present in environmental media and have continued to migrate off-site.

157. Upon information and belief, the Property is located within the capture zone and/or wellhead protection area of Plaintiff's public drinking water supply wells. PFAS are persistent and readily mobile in groundwater and migrate with natural groundwater flow through the aquifer. Consistent with these characteristics and the relative location of the Property to Plaintiff's wells, PFAS and 1,4 Dioxane present at and released from the Property have migrated and continue to migrate or pose a substantial threat of migration, toward and into Plaintiff's supply wells. As a

result, releases and threatened releases from the Property have contaminated and/or threaten to contaminate water pumped for public consumption.

158. As the current owner of a facility at which hazardous substances have been released and from which there has been a threatened release of hazardous substances, NJ MERO is a responsible party within the meaning of 42 U.S.C. § 9607(a)(1).

159. **Doe Defendants 1-20** are unidentified entities or persons whose names are presently unknown and are owner and/or operators of facilities located in and around Plaintiff water sources; whose actions, activities, omissions (a) may have permitted, caused and/or contributed to the contamination of Plaintiff's water sources or supply wells; or (b) may be vicariously responsible for entities or persons who permitted, caused and/or contributed to the contamination of Plaintiff's water sources or supply wells; or (c) may be successors in interest to entities or persons who permitted, caused and/or permitted , contributed to the contamination of Plaintiff's water sources or supply wells. After reasonable search and investigation to ascertain the Doe Defendants' actual names, the Doe Defendants' actual identities are unknown to Plaintiff as they are not linked with any of the Defendants on any public source.

160. The Doe Defendants 1-20 either in their own capacity or through a party caused and/or contributed to the disposal and release of PFAS, 1,4-dioxane, and/or wastes containing such hazardous substances at their facilities, including through: (a) discharges of contaminated stormwater; (b) spills and leaks from storage and handling of PFAS- and solvent-containing products and wastes; and (c) historical practices involving disposal or management of industrial wastewater and solid wastes on or at the facility.

161. Doe Defendants 1-20 caused and/or contributed to the disposal and release of PFAS, 1,4-dioxane, and/or wastes containing such hazardous substances, including through: (a)

discharges of contaminated stormwater; (b) spills and leaks from storage and handling of PFAS- and solvent-containing products and wastes; and (c) historical practices involving disposal or management of industrial wastewater and solid wastes on or at the facility.

162. The Doe Defendants 1-20 facilities are located within the hydrological features servicing Plaintiff's supply wells.

163. Upon information and belief, the Doe Defendants 1-20 properties are located within the capture zone and/or wellhead protection area of Plaintiff's public drinking water supply wells. PFAS are persistent and readily mobile in groundwater and migrate with natural groundwater flow through the aquifer. Consistent with these characteristics and the relative location of the Property to Plaintiff's wells, PFAS and 1,4 Dioxane present at and released from the Property have migrated and continue to migrate or pose a substantial threat of migration, toward and into Plaintiff's supply wells. As a result, releases and threatened releases from the Property have contaminated and/or threaten to contaminate water pumped for public consumption.

164. As the current or former owners or operators of a facility at which hazardous substances have been released and from which there has been a threatened release of hazardous substances, Doe Defendants 1-20 are responsible parties within the meaning of 42 U.S.C. § 9607(a)(1).

## **<u>FIRST CAUSE OF ACTION</u>**
## **Cost Recovery Liability Pursuant to 42 U.S.C. § 9607 (CERCLA)**

165. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

166. Under CERCLA, 42 U.S.C. §§ 9601, *et seq*., owners and operators of facilities are liable for "costs of response incurred by any…person" occasioned by a "release, or a threatened

release which causes the incurrence of response costs, of a hazardous substance," and other forms of compensation. 42 U.S.C. § 9607(a).

167. Plaintiff is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

168. Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

169. CERCLA defines the term "release" broadly and it means, among other things, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment…." 42 U.S.C. § 9601(22).

170. PFOA is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

171. PFOS is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

172. 1, 4 Dioxane is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

173. There have been "releases", and/or continue to be releases, and/or disposal of PFOA, PFOS and 1, 4 Dioxane from each Defendant's facility within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22). Upon information and belief, these releases or threatened releases are ongoing.

174. The hazardous substances, PFOA, PFOS and 1, 4 Dioxane released from Defendants' facilities were, and are being, released within the source water protection area for Plaintiff's Water Source and migrated to Plaintiff's Water Source.

175. Plaintiff has incurred and will continue to incur necessary response costs pursuant to CERCLA § 107(a), all of which are, and will be, consistent with the national contingency plan, as a result of the release and/or threatened releases of hazardous substances, PFOA, PFOS and 1, 4 Dioxane from Defendants' facilities.

176. Each Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as the owner or operator of a facility from which there was a release of hazardous substances PFOA, PFOS and 1, 4 Dioxane that have contaminated Plaintiff's public drinking water supply.

177. By reason of the foregoing, Defendants are liable, jointly and severally, for Plaintiff's necessary response costs, and damages regarding , PFOA, PFOS and 1, 4 Dioxane contamination to Plaintiff's public water supply.

## <u>SECOND CAUSE OF ACTION</u>

**Declaratory Judgment Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2) (CERCLA)**

178. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

179. CERCLA § 113(g)(2) provides in pertinent part: "In any action described in this subsection [, which includes 42 U.S.C. §§ 9607(a),] the court shall enter a declaratory judgment of liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 113 (g)(2).

180. By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Plaintiff is entitled to a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances , PFOA, PFOS and 1, 4 Dioxane contamination in Plaintiff's public drinking water supply as referenced herein.

181. A declaratory judgment will prevent the need for multiple lawsuits as Plaintiff continues to incur costs for which Defendants are liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

182. A declaratory judgment will establish Defendants' allocation of costs associated with addressing the contamination of the public water supply, insuring an equitable and efficient response to the problem.

183. Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Plaintiff's public drinking water supply.

184. Plaintiff will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with hazardous substances, PFOA, PFOS and 1, 4 Dioxane.

185. Plaintiff's costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

186. Plaintiff is thus entitled to a declaratory judgment regarding Defendants' liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

## THIRD CAUSE OF ACTION
**Continuing Public Nuisance**

187. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

188. Plaintiff, its residents, and businesses have the common law right to clean, safe, potable source of water of their own choosing.

189. The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

190. Plaintiff supplied a clean, safe, potable source of water until it was discovered that PFAS contamination had migrated to Plaintiff's water supply.

191. Defendants by their negligent, reckless, and willful acts have caused the release of PFAS from their facilities that, because their facilities are located within the source water protection area for Plaintiff's Water Source, and PFAS and 1,4-Dioxane released from them migrated to Plaintiff's Water Source.

192. Defendants released PFAS and 1,4-Dioxane through direct discharge, water emissions, air deposition, spills, runoff, during defendants' respective manufacturing or operations, and as part of industrial wastewater and solid waste.

193. By their actions, Defendants have unreasonably and substantially interfered with and/or endangered (i) the public right to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater; (ii) Plaintiff's special status and authority regarding its natural resources; (iii) Plaintiff' ability to protect, conserve, and manage its natural resources; and (iv) the rights of the people of its citizens to enjoy their natural resources from interference by pollution and contamination.

194. Defendants' conduct has injured the property, health, safety and/or comfort of a considerable number of persons.

195. The public nuisance caused by the presence of PFAS and 1,4-Dioxane in Plaintiff' drinking water supply, both existing concentrations and those still migrating to it, has affected the public at large and has had, and will continue to have, a significant impact.

196. The acts and omissions of Defendants unreasonably and significantly interfered with, and continue today to unreasonably and significantly interfere with, the common rights of Plaintiff, its residents, and business, to a safe source of drinking water of their own choosing, and have caused and continue today to cause, detrimental effects on the public health, welfare, safety, comfort, and convenience of the residents and businesses, thus creating a public nuisance.

197. Defendants knew or, in the exercise of reasonable care should have known, that the release of PFAS and 1,4-Dioxane into natural resources and Plaintiff's Water Source would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment drinking water relied upon by Plaintiff and the public.

198. As a direct and proximate result of Defendants' conduct, they have created an ongoing public nuisance, and Plaintiff has incurred substantial damages, and will incur additional damages to remove PFAS and 1,4-Dioxane from the public water supply so Plaintiff can provide its residents and consumer with clean and healthy water.

199. The interference with Plaintiff's ability to deliver uncontaminated drinking water far outweighs any social utility of Defendants' actions.

200. As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## FOURTH CAUSE OF ACTION
**Continuing Trespass**

201. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

202. Plaintiff is the owner, operator, and actual possessor of real property and improvements used for collecting drinking water from Plaintiff's Water Source and delivering drinking water to their residents and users of it.

203. Defendants intentionally engaged in the actions that caused the release of PFAS and 1,4-Dioxane from their facilities.

204. Defendants knew, or should have known, that PFAS and 1,4-Dioxane contamination migrated through stormwater runoff, soils, and surface water contaminating Plaintiff' real property used for collecting, treating, and delivering drinking water and the drinking water itself.

205. Defendants did not and do not have authority, privilege, or permission to trespass upon Plaintiff' property interests.

206. The acts and omissions of Defendants caused the PFAS and 1,4-Dioxane contamination to migrate, via surface soils and sediments, stormwater runoff, the ground, and the groundwater, contaminating Plaintiff's real property used for collecting, treating, and distributing drinking water, interfering with its property rights, including Plaintiff's right to the full use and enjoyment of its water system for treatment and distribution to residents and businesses. These acts and omissions created a trespass on Plaintiff's property and unlawful interference with Plaintiff's property rights.

207. As a direct and proximate cause of Defendants' conduct in creating an ongoing trespass against Plaintiff's property, in the form of the ongoing PFAS and 1,4-Dioxane

contamination of Plaintiff's water system, Plaintiff has incurred substantial damages and will incur additional damages to remove PFAS and 1,4-Dioxane from the public water supply in order to provide their residents and customers with clean and healthy water.

208. As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined at the time of trial.

## FIFTH CAUSE OF ACTION
**Negligence**

209. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

210. Defendants knew or should have known that PFAS and 1,4-Dioxane and PFAS and 1,4-Dioxane containing products and materials, and other toxic chemicals, create a substantial risk of harm to surface water and to members of the public who consume such surface water.

211. Defendants knew or should have known that the chemicals containing PFAS and 1,4-Dioxane and other toxic substances which they were distributing, purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm contaminating the soils and surface waters and therefore, Plaintiff's Water Source.

212. Defendants negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of PFAS and 1,4-Dioxane at and from their facilities and/or properties as to cause severe contamination of surface waters and soils and/or said Defendants own or owned the properties upon which such actions and/or results occurred.

213. Defendants owed Plaintiff a duty to act as reasonable operators and/or owners of property and to take all necessary precautions to prevent the release of PFAS and 1,4-Dioxane and other toxic chemicals into the surface waters, soil and groundwater at their properties.

214. Defendants owed Plaintiff a cognizable duty to exercise reasonable care in the purchasing, transporting, using, processing, mixing, storing, handling and/or disposing of PFAS and 1,4-Dioxane and/or in owning property upon which such actions and/or results occurred to take reasonable measures to prevent the release and spread of PFAS and 1,4-Dioxane and other toxic chemicals into the hydrological features and into Plaintiff' Water Source.

215. Defendants owed Plaintiff a duty to act as reasonable operators and/or owners of property and to take all necessary steps to prevent the continuing and future release of PFAS and 1,4-Dioxane from their facilities and/or properties.

216. Upon learning of a release of solvents and compounds, including but not limited to PFAS containing products and PFAS and other toxic chemicals, at their facilities and/or properties, Defendants owed Plaintiff a duty to act reasonably to remediate, contain, and eliminate the release before it contaminated Plaintiff's Water Source.

217. Defendants breached the above duties and failed to prevent the releases of PFAS and 1,4-Dioxane containing products at their properties.

218. Defendants also failed to take reasonable, adequate, and sufficient actions to eliminate, correct, or remedy the releases of PFAS and 1,4-Dioxane and other toxic chemicals after they occurred.

219. Defendants continue to breach their duties to remediate and prevent ongoing and future releases of PFAS and other toxic chemicals from their properties into Plaintiff's Water Sources.

220. As a result of Defendants' breaches of their duties, Plaintiff has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' contamination for many years into the future.

221. Defendants' breach of their duties were the direct, sole and proximate cause of Plaintiff's damages.

222. As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## SIXTH CAUSE OF ACTION
**Failure To Warn**

223. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

224. Defendants breached their duty to notify and warn Plaintiff of the likelihood of release of hazardous substances, including but not limited to PFAS and 1,4-Dioxane and other toxic chemicals, at and in the vicinity of Defendants' facilities, and, consequently, in the capture zone of Plaintiff's Water Source.

225. Upon learning of the release of hazardous substances, including but not limited to PFAS and 1,4-Dioxane and/or products containing PFAS and 1,4 Dioxane, and other toxic chemicals at their facilities and/or properties, Defendants owed Plaintiff a duty to timely notify and warn Plaintiff of the releases.

226. Defendants breached that duty by failing to timely notify and warn Plaintiff of the releases of hazardous substances, including but not limited to PFAS and 1,4-Dioxane and other toxic chemicals, on and under their properties and, consequently, into Plaintiff's Water Source.

227. As a result of Defendants' breaches of their duty to warn Plaintiff, Plaintiff was forestalled from undertaking effective and immediate remedial measures, and Plaintiff has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

228. As a direct and proximate result of Defendants' above-described failure to provide

warnings, Plaintiff has incurred and will continue to incur the following damages:

a. Existing contamination of Plaintiff's water supply, which may have been prevented or mitigated if timely warnings were given;

b. Costs of additional testing and monitoring of the hydrological features and Plaintiff's drinking water well for hazardous substances, including but not limited to PFAS, 1,4-Dioxane and other toxic chemicals' contamination;

c. Costs of investigations, risk assessment, and planning mitigation measures to address the contamination by hazardous substances, including but not limited to PFAS, 1,4-Dioxane and other toxic chemicals;

d. Costs of treatment for hazardous substances, including but not limited to PFAS, 1,4-Dioxane and other toxic chemicals, including design, installation and operation of remediation systems to remove PFAS and 1,4-Dioxane to a safe level of non-detect;

e. Loss of water production capacity;

f. Diminished consumer confidence in Plaintiff's drinking water;

g. Potential cost to design and install replacement water sources;

h. Attorney fees and costs; and

i. Other compensatory damages.

229. As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## <u>SEVENTH CAUSE OF ACTION:</u>
## Cleanup and Removal Costs Pursuant to New Jersey Spill Act NJSA. 58:10-23.11

230. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

231. Under NJSA, N.J.S.A. 58:10-23.11g c(1), *et seq*., "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department or a local unit pursuant to

subsection b. of section 7 of P.L.1976, c.141."

232. Plaintiff is a "person" within the meaning of Section of N.J.S.A. 58:10-23.11b.

233. Each Defendant is an "owner" and or/ "person" within the meaning of Section of N.J.S.A. 58:10-23.11b.

234. N.J.S.A defines the term "Hazardous substances" broadly and it means, among other things, "the environmental hazardous substance list adopted by the department" and "the list of toxic pollutants designated by Congress or the United States Environmental Protection Agency pursuant to section 307 [33 U.S.C. 1317] of that act; and the list of hazardous substances adopted by the federal Environmental Protection Agency pursuant to section 101 of the "Comprehensive Environmental Response, Compensation and Liability Act of 1980," Pub.L.96-510 (42 U.S.C.s.9601 et seq.) …." N.J.S.A. 58:10-23.11b

235. PFOA is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.; and N.J.A.C. 7:1E App. A

236. PFOS is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602 and N.J.A.C. 7:1E App. A.

237. 1, 4 Dioxane is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602. and N.J.A.C. 7:1E App. A

238. PFNA is a "hazardous substance" by designation pursuant to section N.J.A.C. 7:1E App. A

239. PFPEA is a "hazardous substance" by designation pursuant to section N.J.A.C. 7:1E App. A

240. PFNA is a "hazardous substance" by designation pursuant to section N.J.A.C. 7:1E App. A

241. PFBS is a "hazardous substance" by designation pursuant to section N.J.A.C. 7:1E App. A

242. PFHXA is a "hazardous substance" by designation pursuant to section N.J.A.C. 7:1E App. A

243. PFHXS is a "hazardous substance" by designation pursuant to section N.J.A.C. 7:1E App. A

244. PFBA is a "hazardous substance" by designation pursuant to section N.J.A.C. 7:1E App. A

245. PFHPA is a "hazardous substance" by designation pursuant to section N.J.A.C. 7:1E App. A

246. PFDA is a "hazardous substance" by designation pursuant to section N.J.A.C. 7:1E App. A

247. PFPES is a "hazardous substance" by designation pursuant to section N.J.A.C. 7:1E App. A

248. PFHPS is a "hazardous substance" by designation pursuant to section N.J.A.C. 7:1E App. A

249. NJSA defines "Discharge" as "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the

jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State" N.J.S.A. 58:10-23.11b

250. NJSA defines the term "Cleanup and removal costs" as "all direct costs associated with a discharge, and those indirect costs that may be imposed by the department pursuant to section 1 of P.L.2002, c.37 associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property, shorelines, beaches, surface waters, water columns and bottom sediments, soils and other affected property, including wildlife and other natural resources, and shall include costs incurred by the State for the indemnification and legal defense of contractors pursuant to sections 1 through 11 of P.L.1991, c.373 (C.58:10-23.11f8 et seq.)" N.J.S.A. 58:10-23.11b

251. There have been "discharges", and/or continue to be discharges, and/or disposal of PFOA, PFOS, PFNA PFPEA, PFBS, PFHXA, PFHXS, PFBA, PFHPA, PFDA, PFPES, PFHPS and 1, 4 Dioxane from each Defendant's facility within the meaning of Section N.J.S.A. 58:10-23.11b. Upon information and belief, these discharges or threatened discharges are ongoing.

252. The hazardous substances, PFOA, PFOS, PFNA PFPEA, PFBS, PFHXA, PFHXS, PFBA, PFHPA, PFDA, PFPES, PFHPS and 1, 4 Dioxane discharged from Defendants' facilities were, and are being, discharged within the source water protection area for Plaintiff's Water Source and migrated to Plaintiff's Water Source.

253. Plaintiff has incurred and will continue to incur necessary Cleanup and removal costs as a result of the release and/or threatened releases of hazardous substances, PFOA, PFOS,

PFNA PFPEA, PFBS, PFHXA, PFHXS, PFBA, PFHPA, PFDA, PFPES, PFHPS and 1, 4 Dioxane from Defendants' facilities.

254. Each Defendant is therefore responsible, and liable for necessary response costs as the owner or operator of a facility from which there was a release of hazardous substances PFOA, PFOS, PFNA, PFPEA, PFBS, PFHXA, PFHXS, PFBA, PFHPA, PFDA, PFPES, PFHPS and 1, 4 Dioxane that have contaminated Plaintiff's public drinking water supply.

255. By reason of the foregoing, Defendants are liable, jointly and severally, for Plaintiff's necessary response costs, and damages regarding, PFOA, PFOS PFPEA, PFBS, PFHXA, PFHXS, PFBA, PFHPA, PFDA, PFPES, PFHPS and 1, 4 Dioxane contamination to Plaintiff's public water supply.

## PRAYER FOR RELIEF

WHEREFORE, based on the forgoing claims, Plaintiff request that the Court grants the following relief: [32]

1. Find the Defendants liable for necessary response costs as the owners or operators of a facility from which there has been and is a release of hazardous substances PFAS and 1,4-Dioxane that have contaminated Plaintiff's public drinking water supply, and order Defendants to reimburse the Plaintiff for its past, present, and future costs to investigate, monitor, evaluate, and remediate the PFAS and 1,4-Dioxane that continues to migrate into Plaintiff's public water supply, including the costs of employing outside consultants and testing labs for these tasks.

[32] Plaintiff expressly disclaims recovery for PFAS contamination from aqueous film-forming foam (AFFF).

2. Issue a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances, PFAS and 1,4-Dioxane contamination in the Willingboro Municipal Utilities Authority public drinking water supply.
3. Award Plaintiff monetary damages for the continuing trespass, continuing public nuisance, negligence, and failure to warn caused by the PFAS and 1,4-Dioxane contamination of the Plaintiff's public water supply.
4. Order Defendants to pay for or agree to reimburse the cost of a treatment system(s) to be installed by Plaintiff to remove PFAS and 1,4-Dioxane from the public water supply.
5. Award Plaintiff its reasonable attorney fees and legal expenses incurred in evaluating the PFAS and 1,4-Dioxane contamination and prosecuting these claims.

Award Plaintiff such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims for which a jury trial is available.

Dated: March 25, 2026

Respectfully submitted,

*/s/ Robert Gitelman*
Robert Gitelman, Esq.
**NAPOLI SHKOLNIK PLLC**
400 Broadhollow Road, Suite 305
Melville NY 11747-4810
Tel. (212) 397-1000
RGitelman@napolilaw.com

Andrew Croner, Esq.
*(Pro Hac Vice Forthcoming)*
James L. Simpson, Esq.
*(Pro Hac Vice Forthcoming)*
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, Floor 11
New York NY 10017-6502
Tel. (212) 397-1000
ACroner@napolilaw.com
JSimpson@napolilaw.com

Paul J. Napoli, Esq.
*(Pro Hac Vice Forthcoming)*
Coral M. Odiot, Esq.
*(Pro Hac Vice Forthcoming)*
Jose J. Rios, Esq.
*(Pro Hac Vice Forthcoming)*
**NS PR LAW SERVICES LLC**
1302 Avenida Ponce de León
San Juan PR 00907-3982
Tel. (833) 271-4502
PNapoli@nsprlaw.com
COdiot@nsprlaw.com
JRios@nsprlaw.com

***Counsel for Plaintiff***